IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TONI R DONAHUE, individual and on
behalf of minor child, DCD
_____

Plaintiff(s)

Vs.                                          Case No. _____
                                                     2:17-cv-02435 -JWL-TJJ

GOVERNOR SAM BROWNBACK in personal and professional capacity;
Kara Nicholson , KS DCF, in personal and professional capacity;
Trisha Thomas, Director of Child Support Services
DCF; Phyllis Gilmore, Office of the Secretary DCF
Stephen M. Howe, Johnson County District Attorney;
Danielle Bartelli, President KVC
_____

Defendant (s)

Statement of Claim

Plaintiff brings this action under multiple cause of action pursuant to 42 U.S.C. §§ 1983

("section 1983"), 1986; 1988 and 12133; 28 U.S.C. § 1343(a)(3); 20 U.S. Code § 1401

**Background**

1.      According to documentation provided by Olathe Unified School District #233 (OSD)

DCD reportedly served "shock time" in a 5x4 isolation prison cell, located inside his autism

classroom at Prairie Center Elementary School, on at least 6 occasions between 4/10/2015 and

10/23/2015.  Plaintiff has reason and cause to believe that DCD was forced into the isolation

prison cell more frequently than the teacher reported.  During this time he severely digressed

emotionally, socially, educationally, and suffered approximately 65-75 moderate injuries including injuries to his head, torso, back, arms, and legs, periodic occurrences of handprint bruising on his arms, wrists, ankles, and feet only while in the care of one educator. DCD began wetting the bed nightly, getting up to turn off the alarm hours before it sounded in the mornings, having panic attacks, anxiety attacks, and going into hysterics screaming, crying, and hiding when the bus pulled up to the door. On the occasions that TD confronted the teacher, DCD would come home with more injuries. The failure to add safeguards such as video monitoring caused DCD's prolonged, unchecked abuse and torture at the hands of his educator.

2.      Governor Sam Brownback signed into law the Freedom from Unsafe Seclusion and Restraint Act on May 27, 2015. The passage of The Freedom from Seclusion and Restraint enabled Kansas school districts to legally construct and use prison isolation cells inside school special needs classrooms.

3.      Governor Sam Brownback signed the Freedom from Unsafe Seclusion and Restraint Act with the full knowledge of the United States Senate, HEALTH, EDUCATION, LABOR, AND PENSIONS COMMITTEE Final Report (Majority Committee Staff Report February 12, 2014) and the Government Accountability Report (GAO, 2009) Both clearly state the children exposed to these prison isolation cells have little or no protection from abusive educators, the practice causes serious short and long term trauma for all children (both the children witnessing the implementation on other students, and especially the children who are forced into these rooms). Both reports indicate that children exposed to the practice experienced severe psychological trauma, physical injuries, and death. Both reports indicate a widespread practice of educator abuses related to the use of the cells.

4.      The Senate report and the GAO report do **NOT** recommend the use of these cells and if the states are determined to use these cells, to only use them in cases of "imminent threat of **serious** bodily injury".

5.      According to IDEA 2004: "The term "serious bodily injury" is defined in Section 1365(h)(3) of Title 18, U.S. Code, to mean a bodily injury that involves a **substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty**. [615(k)(7)(D)]

6.      Governor Brownback changed the language to only use seclusion and restraint to "imminent *risk* of bodily injury" This act set aside both the Senate and GAO's intensive multiple studies proving the dangers to the children amounting to torture, and allows the teachers to implement the punishment based on their opinion of what "*may*" happen next "*may*" cause a scratch, or papers to land on the floor. DCD's teacher forced him into the cell on 4/10 for pushing papers onto the floor.  Under no legal circumstance would a "typical" child be jailed for pushing papers on the floor.  Nor would any "typical" child (or adult) be incarcerated for what "*may*" happen in the future.

7.      The practice of using the prison isolation cell on DCD amounted to torture and DCD suffered symptoms similar to a prisoner of war.  He was terrified of his teacher.  DCD continues to suffer from PTSD and related symptoms from his horrific experience inside Prairie Center Elementary School in the Olathe School District USD #233.

8.      Governor Brownback's Freedom from Unsafe Seclusion and Restraint, in its entirety, failed to protect the children exposed, including DCD, under the color of law and in fact provided the means for educators to legally abuse their students by removing all forms of essential constitutional protections. This bad faith, discriminatory, and draconian Act, in its entirety, denied DCD the civil rights protections afforded by the United States Constitution.  It, in effect, created an alternate Constitution and set of statutory laws/rules resurrecting *segregation in laws* - the equivalent of Jim Crow laws targeting the disabled student population.

9.      Plaintiff contacted Governor Brownback to discuss the Freedom from Unsafe Seclusion and Restraint statutes directly with the governor.  On 11/17/2015 Plaintiff met with Constituent Services on behalf of Governor Brownback.  During this meeting, the representative had no idea these prison isolation cells were in existence let alone endorsed by Governor Brownback or state law.

10.      February 9, 2015 Plaintiff and DCD together addressed Kansas legislatures regarding DCD's experience, the abuses, the isolation room, and the gross violation of his human rights.

11.      Plaintiff found out Governor Brownback would be present for a juvenile justice bill signing at Olathe, Kansas Court.  She and minor child went together and spoke with Governor Brownback in person following the event.  The Plaintiff explained who she was, and why she was there and provided Governor Brownback with a printed copy of the testimony she delivered to Kansas Legislatures on 2/09/2016.  This copy included photos of the isolation cell inside DCD's classroom and the testimony itself was a statement addressed directly to Governor

Brownback and covered the human rights violations.  Governor Brownback read the document, folded it in half, and placed it in his inside jacket pocket.

**Plaintiff is challenging the constitutionality of the law.  She contends that the law violated DCD's protections by the United States Constitution as described in the Bill of Rights:**

12.    **4th Amendment:**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

13.    **5th Amendment:**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, **nor be deprived of life, liberty, or property, without due process of law**; nor shall private property be taken for public use, without just compensation.

The educator had no previous education or training in law enforcement, corrections, law as a profession, paralegal, judge, juvenile justice, parole/probation officer or any other position or office pertaining to the legal, judicial, or correctional system.  She was allowed to repeatedly

force DCD into an isolation prison cell at her leisure with no ramifications or proof of her statements, witnesses, or any type of oversight.

14.    **6th Amendment:**

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

- to a speedy and public trial

- to trial by an impartial jury

- to be informed of criminal charges

- to confront witnesses

- to compel witnesses to appear in court

- to assistance of counsel

On 4/10, 9/18, and 10/23/2015 Dr███ was given "shock time" with no adjudication prior to his sentencing, he was not given any representation in the classroom, was not informed of his criminal charges, read his Miranda rights, and was not provided with the opportunity for a trial by jury

15.    Under the Freedom from Unsafe Seclusion and Restraint Act, DCD's educator, Carin Bright, became the accuser, arresting officer, judge, jury, prison warden, and parole officer.

Denying all rights afforded to the minor child.  The incarceration without representation was entirely based on Carin Bright's filtered statement following the incidents.

16.     Governor Brownback gave the Autism teacher at Prairie Center Elementary School the immeasurable power to torture DCD with impenetrable state protections against accountability.

17.     **8th Amendment**

Excessive bail shall not be required, nor excessive fines imposed, **nor cruel and unusual punishments inflicted.**

DCD did not have either the mental capacity, or the abstract thought to comprehend what was occurring when he was forced into the isolation prison cell.  At no time was he provided with information in any form, such as a social story, explaining the parameters for the use of the isolation room.  DCD's educators actions combined with the use of the isolation prison cell amounted to mental, psychological, emotional, and physical torture.  DCD's educational environment was hostile daily with the Isolation prison cell located roughly 3 feet from his desk. The cell itself was an ever present threat of danger.

18.     **14th Amendment**

due process and equal protection under 42 U.S.C. § 1983; § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; Title II of the Americans with Disabilities Act, 42 U.S.C. § 1231 et seq. and state law.

**TD contends that the law violates international human rights articles set forth by United Nations in the Universal Declaration of Human Rights:**

19.    *Article I*

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

20.    *Article 2*

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

21.    *Article 3*

Everyone has the right to life, liberty and security of person.

22.    *Article 5*

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

23.    *Article 6*

Everyone has the right to recognition everywhere as a person before the law.

24.    *Article 7*

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

25.    *Article 9*

No one shall be subjected to arbitrary arrest, detention or exile.

26.    *Article 10*

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

27.    *Article 11*

1. Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defense.

2. No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a penal offence, under national or international law, at the time when it was committed.

28.    *Article 26*

2. Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace.

3. Parents have a prior right to choose the kind of education that shall be given to their children.

29.    The passing of this law by Governor Brownback violates the Rome Statute. **Torture** is defined in the Rome Statute as "the intentional infliction of severe pain or suffering, whether physical or mental, upon a person in the custody or under the control of the accused."

30.    TD also contends the law passed by Governor Brownback violates the Kansas State Constitution

**Targeting a specific and federally protected culture (disabled population):**

31.    The prison cells are located inside the special needs classrooms. There are no cells located inside general education classrooms.

32.    The cells are not located in central areas. Nor are they visible or accessible to anyone outside of the special needs classroom.

33.    The prison cell inside DCD's classroom was front and center, located roughly 3 feet from his desk. The cell was an ever present threat and created a hostile learning environment.

34.    The design of Governor Brownback's task force clearly targets the special needs population by exclusively utilizing professional members of the special needs community and specifically requiring members have special needs children. The task force does not require the

members to have "typical" children.  The task force members are discriminatory and clearly

indicate the law was created targeting the special needs population and NOT the general student

population.

35.     In the Olathe School District, during the first semester of the 2015-16 school year, 26

students were forced into these cells 480 times.  All 26 students were special needs students; all

26 had IEP's.  The same time frame, Blue Valley School District 100% of the student exposed

were special needs students with IEP's.  The same time frame, Shawnee School District 100% of

the students was special needs students with IEP's.  Not one typical student was forced into the

prison cells in any of the districts even when adult staff members and students attacked a student,

even when two teens were in a knife fight, even with the many fist fights and imminent threats of

violence between "typical" students.  These rooms are designed exclusively for use on special

needs students.

36.     "Typical" students have separate and completely different state laws and local policies

for violating the student code of conduct – even in violent circumstances.

**Failure to Protect:**

37. Governor Brownback failed to provide follow-up oversight on existing isolation cells and /or

construction of cells.  According to state law and federal guidelines, all isolation rooms are to be

in proportion in size to other rooms frequented by the student throughout the day.   Kansas

isolation rooms are roughly 5x4 in all the major districts.  This is, in fact, smaller than a

bathroom stall and nowhere near the size and proportion of any other rooms students frequent.
KS 72-89d03(e)

38.    The Freedom from Unsafe Seclusion and Restraint Act failed to protect DCD by
endorsing a practice that has been proven to cause severe psychological, emotional, and/or
physical trauma and put his life in jeopardy as a direct result of passing the Act.

39.    The entire Freedom from Unsafe Seclusion and Restraint Act is a one sided law
protecting only the staff and districts.  There are absolutely no protections in this law for
students.

40.    Many of the children in special needs classrooms, including DCD, are non-verbal and
have no way to report the abuses inside the classroom.  Governor Brownback failed to
implement safe-guards for the students before, during, and after their "shock-time" incarceration.

41.    All juvenile centers, prisons, and psychiatric facilities using isolation prison cells, have
video protections in place for both the staff and the individuals.  Any reasonable individual
would expect video protections for the most vulnerable population, many of whom are non-
verbal. Governor Brownback's law created soft targets for abuse by failing to implement video
protections.  DCD had no way to convey the abuses he was suffering at the hands of his educator
and his classroom became a torture chamber under the color of law.

42.    Videos cannot be falsified like the documentation currently required- and videos would have ensured the integrity of the individuals who claim they cannot implement evidence based practices without the use of the isolation prison cells.

43.    The requirements of the law are handwritten statements by the educators.  These statements can be, and often are, falsified to fit the language of the law.  On the 4/10 incident, DCD was forced into the room and at the time the staff and district contended that it was for "positive behavior supports".  After May 27th, 2015 the language changed and became "imminent threat of harm".  The same punishment, different written rational with two totally opposite meanings.  The teachers who use these rooms will write in whatever the law requires them to in order to continue the bad practice.

44.    The 9/18 incidents, the principal filtered the teacher's statement over a telephone call which was not a conference call.  During the official meeting with the principal, teacher, and Plaintiff, after Plaintiff asked about the handprint bruising on DCD's ankles, Plaintiff demanded that any para present needed to attend the meeting to validate the teacher's story.  The legal requirement is that anyone present during the incident be in the meeting.  The teacher stated she was alone with three 1:1 students and had to cut DCD's breakfast and lunch short that day due to a shortage of paras because of the budget cuts.  She stated that her paras came in later in the day.  However, on the data submitted to the state for the ESI incident, paras were added as staff present – these additions were not listed on the documents TD received.  The statements submitted during the subsequent KSDE investigation were prepared by the district and the

district staff counsel and were worded to completely exonerate the teacher per the language of Governor Brownback's law.

45.     On the 10/23 incidents the district special needs coordinator had a meeting with the teacher and principal prior to Plaintiff's arrival. This meeting was a coaching session from the district to the teacher. However, Plaintiff recorded the official ESI meeting on a handheld recorder. The state required documentation provided to TD did not have any witnesses listed. The state required documentation had the date October 22nd written on it and October 23nd written over the top of it. During the recorded meeting, the teacher failed to identify exactly when DCD was placed in the cell. Plaintiff repeatedly asked her but the teacher continued to refer back to previous days. At no time did she indicate a plausible reason to use the cell on any of the days she was discussing, especially 10/23. In one portion of the recording, the teacher attempted to emphasize a "violent" outburst from the previous day and referred to the principal alleging DCD hit her. Plaintiff asked if it was "imminent threat" and the principal laughed and said "no". The required documentation to be submitted to the state had additional staff members present and on a second data sheet for the state showed an ESI incident from a different day with times and staff members was marked through with a black scripto. Directly below this entry was the entry for 10/23 and had even more additional staff members than the other documents. DCD was the only student at Prairie Center who had any ESI incidents. The statements to KSDE for the subsequent investigation was also prepared in retro by the district and the district staff counsel but this time they were unaware that Plaintiff had recorded the meeting. The statements for the ESI incident were completely fraudulent. The Freedom from Unsafe Seclusion and

Restraint's requirements for handwritten statements is arbitrary and in place for the sole purpose of protecting school districts.

46.    There are no safeguards in place to prevent falsification of documentation.

47.    There are no legal ramifications/consequences for Educators who falsify data or submit fraudulent statements on data, documentation, during KSDE investigations, or USDOE investigations.

48.    On 9/18/2015 the educator was alone with DCD and two other students with Autism. When she forced DCD into the cell, she was the only witness to determine if the action was warranted, her statement changed several times, and eventually collaborated with the administration and the staff lawyer to create an entirely fraudulent statement for the Kansas State Department of Education investigation.

49.    Governor Brownback is the head of the Department of Children and Families (DCF). With the implementation of the Freedom from Unsafe Seclusion and Restraint, Brownback failed to include required training for DCF social workers in how to recognize/identify educator abuse, or any protections for potentially abused special needs children inside Kansas classrooms.

50.    Governor Brownback failed to implement policy changes at DCF in accordance with the legalization of isolation prison cells inside special needs classrooms.

51.     Governor Brownback omitted language in the law that would allow parents to be

mandated reporters and require DCF to investigate legitimate claims of educator abuse.


52.     Governor Brownback failed to implement training for local police departments for

investigations pertaining to educator abuse in relation to the isolation prison cells.


53.     Governor Brownback failed to require a disability liaison officer at local police stations

trained to impartially investigate disability related complaints.

Plaintiff contacted the Olathe Police Department on 12/03/2015 and filed an initial complaint.

As the plaintiff was discussing the complaint with Officer Almador, a female officer interjected

that another family had filed a complaint the week prior for the same reason.  On 12/22/2015

Plaintiff met with Detective McMillan at the Olathe Police Department with the purpose of

delivering and discussing the documented injuries including photos and videos.  However, when

Plaintiff arrived at OPD, the detective informed her that he had already been to the school and

following the statements provided by the teacher, he had determined not to continue the

investigation.  The Detective was not interested in viewing the abuse evidence; he had the

attitude that DCD "had it coming" and was in essence, a violent monster, based entirely off the

statement of the accused abuser.  He continued to call DCD's abuser a "hero".  The detective

reacted as if plaintiff was an emotional parent rather with no basis for the complaint.  No due

diligence was provided, no equal protection under the law was provided.  The detective's

decision to not investigate was entirely discriminatory based on his ignorance and lack of

training.  Plaintiff asked the detective if he knew the difference between non-disability related

assault and maladaptive behaviors and he said, "no, I don't need to know the difference".  After

the Plaintiff left the station, she telephoned the OPD and spoke with a captain.  Plaintiff inquired

about the disability training provided to the officers and/or detectives.  The captain responded, "I

know a sheriff who has a disabled child".  Plaintiff then provided the captain with her credentials

and he stated he would re-open the investigation.  Plaintiff asked if it would have any other

outcome if the police had no training, they would not recognize the assaults taking place in the

classroom and the captain stated it most likely would not.  Plaintiff then contacted Deputy Chief

Reynolds and set an appointment to speak in person.  During that meeting, Reynolds explained

that the plaintiff was "taking on the largest business in Olathe, with 30,000 patrons, the largest

district in the state of Kansas, and the largest district in the KC metro area".  His position was

that the plaintiff could not win.  Many of the officers, detectives, and other OPD staff had

attended Olathe public schools and had a natural bias.  The lack of training and accountability of

the local police in investigating educator abuse allowed DCD's abuser to escape charges.


54.    As of the date of this filing, no investigation has been made into the torture, educator

abuse, or illegal use of the isolation prison cell at Prairie Center Elementary School, perpetrated

against minor child, DCD.  The district publicly stated, on KSHB 41 news, and during the KSDE

investigation, that DCF and the OPD conducted "thorough" investigations and determined that

the plaintiff's claims were entirely false.  To date, no investigations have occurred whatsoever.

This brings to point that DCD has received no justice (let alone "equal justice") for what he

endured at the hands of a violent educator.  By all appearances, it seems to ring true that the

police and DCF protected the interest of the school district rather than the rights of a disabled

child.

55.     Governor Brownback failed to implement protections in the Freedom from Unsafe Seclusion and Restraint laws for parents who file complaints against Districts.  Plaintiff filed a series of complaints with different agencies and following the realization, the Olathe School District Staff Counsel, Scott Mason, filed a retaliatory truancy claim against the Plaintiff in an attempt to have the minor child removed from her home.  The Johnson County District Attorney was provided the timeline and documentation proving the timeline on two occasions prior to the filing and one time immediately following.  The DA did not investigate the district's claim prior to his filing against the Plaintiff, nor did he consider the infallible documentation provided by the plaintiff.  As a result, the plaintiff spent the next nine months proving her value as a parent, educator, and human being in repeated hearings and subsequent investigations.  Had Brownback included protections for families who file complaints, the plaintiff would not have been forced to endure the nine months of arbitrary hearings.  The end result was that the plaintiff was completely exonerated of all allegations in a stellar report written by KVC.

56.     Governor Brownback failed to adjust the "stay put" laws in order to protect children who are abused by educators.  Under the current law, the Plaintiff was only given the single option of returning DCD to the care of his accused abuser for the duration of the investigation, or be reported for truancy and CINC.  This act in itself would be child abuse.  After months of torture, to force a child to be in the same vicinity and full exposure to his abuser would reflect poor parenting, indifference to abuse, and expose the child to further emotional and psychological detriment.

57.     In cases of abuse, the state of Kansas has the obligation to remove the accused educator from the classroom during the investigation rather than the victim.  The student has an IEP with placement listed, the educator does not.

58.     The state of Kansas, under federal law, is required to provide disabled children an education in a safe learning environment according to IDEA 2004 and FAPE.

59.     isolation cells violate. Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law, Title 42, U.S.C., Section 14141

**Kara Nicholson Department of Children and Families, individual and professional capacity:**

60.     Kara Nicholson, Department of Children and Families in her individual and professional capacity, failed to investigate Plaintiff's abuse complaint against the educator demonstrating blatant and willful neglectful indifference.

61.     On 12/08/2015 Plaintiff contacted DCF Child Protection Services and reported educator abuse against minor child, DCD.  Kara Nicholson was assigned the investigation.  Plaintiff had a folder prepared with all the allegations, documents, photos, videos, and the abuse checklist provided by the DCF website indicating that DCD had suffered ALL of the warning signs that DCF is trained to recognize as abuse.  Upon arrival at the Plaintiff's home, Nicholson took the verbal statement but did not look at any of the evidence.  She stated she would go to the school and interview the teacher, the staff, and the district.

62.    When Nicholson returned to the plaintiff's home, the plaintiff met her at the door to find

out Nicholson was there to investigate the plaintiff for a Truancy claim on behalf of the district,

(this retaliatory truancy claim was filed AFTER the plaintiff filed complaints against the district

with the police, DCF, Department of Justice, KSDE, ACLU, and the Disability Rights Center).

In shock, the plaintiff asked what had happened to the original complaint and asked if Nicholson

had the opportunity to view the isolation prison cell. Nicholson stated that she had not. When

asked why, Nicholson stated she had not spoken to the teacher. Plaintiff, in disbelief, asked why

she had not spoken to the teacher. Nicholson's reply, "because she did not call me back".

Nicholson closed the abuse claim against the teacher as "unsubstantiated" without investigating

it whatsoever. She had not been to the school, spoken with the teacher, any staff member, or the

district. She had not viewed the injuries, reviewed the documentation, or watched the videos,

she had also not listened to the recordings. Nicholson did not look at one piece of evidence to

support the plaintiffs original abuse allegation against the educator. To date, no agency has

advocated on behalf of DCD for the injuries or torture he endured at the hand of his educator.


**Malicious Prosecution:**


**Johnson County Kansas District Attorney**

 **Case 15JC38**

63.    The Johnson County District Attorney knowingly filed a malicious petition for truancy

and therefore CINC against the plaintiff. Having a full knowledge of his actions and motives,

the DA was abusing his authority, neglectfully indifferent, engaged in dereliction of his duties,

and behaving in a corrupt and dishonest manner, purposefully jeopardizing the plaintiff and her

minor child's family unit, welfare, security, and stability with no legal cause and in violation of the plaintiff's protected rights.

64.    The DA, alleged truancy dates to include October 26-30th 2015 which were days included in a religious exemption listed in DCD's IEP.  These days are vacated by plaintiff and minor child every year.  Plaintiff and minor child do not recognize Halloween as a holy day and therefore do not participate in any associated activities.  Plaintiff limits DCD's exposure to Halloween and generally takes a vacation this time of year.

65.    These dates were also excused via audio recording from the official staff meeting regarding the ESI incident on 10/23/2015 and emails between the District and the Plaintiff.  By including these dates in the petition, the DA violated the plaintiff's constitutionally protected rights to religious liberty.

66.    The rest of the dates listed on the truancy petition were considered excused for extenuating circumstances due to the serious nature of the crimes against minor child and the districts refusal to place DCD in a safe environment.  The conversations were ongoing with various staff members at various levels throughout the district all the way up the ladder to the president of the board of education and the superintendent of schools.  The Plaintiff provided all of the information to the DA prior to his filing.

67.    According to the DA website, the DA is required to investigate all claims prior to filing a criminal complaint against an individual, to ensure the validity of the complaint KSA 72-113 (f) Whenever a county or district attorney receives a report required under this section, the county or district attorney shall investigate the matter.  dOn three separate occasions, the Plaintiff hand delivered a preponderance of retaliation evidence to the DA's office, including the separate complaints to

KSDE and to the Department of Justice. Two of those deliveries were prior to the DA filing the petition and one was post filing.

68.    The DA showed deliberate indifference and was neglectful in his duties to the plaintiff, the minor child, DCD, and citizens of his district by filing against a person who had a series of ongoing disability rights complaints against the school district and was therefore protected by IDEA 2004, and section 504 of the Rehabilitation Act of 1973 (Section 504), 29 USC 794 and its implementing regulation, 34 C.F.R. 104. Section 504 prohibits discrimination on the basis of disability by recipients of Federal financial assistance. Section 504 regulation, 34 C.F.R. 104.61 incorporates by reference the regulatory provision of the Title VI of the Civil Rights Act of 1964 at 34 C.F.R. 100.7(e) which prohibits retaliation, including intimidation, threats, coercion, or discrimination, for engaging in an activity that is protected under the laws. Protected activities include opposing discrimination or any act or practice made unlawful by these laws, or making a complaint, testifying, assisting, or participating, in any manner in an investigation, proceeding, or hearing, under these laws.

69.    Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. 12131 and its implementing regulation, 28 C.F.R. Part 35. Title II prohibits discrimination on the basis of disability by public entities. The Title II regulation at 28 C.F.R. 35.135 also prohibits retaliation for engaging in an activity that is protected under Title II. As a recipient of FFA from the Department and a public entity, the district was subject to those laws at the time of the truancy petition.

70.     Furthermore, as the DA determined to move forward in a petition against two protected individuals, the DA grossly violated the aforementioned protected rights of the plaintiff and minor child, DCD for duration of nine consecutive months.

71.     The Plaintiff asserted her protected rights at every hearing.  Plaintiff made clear to the court that the child was in need of care, not from the plaintiff, but from the school teacher who was abusing him.  At no time did the DA order an investigation into the abusive educator.

72.     Although the family court Judge determined there was no Truancy during the first hearing, the inquiry did not stop, (procedural law requires that if there is no crime the inquiry must stop).  Instead, the DA increasingly demanded further action from the plaintiff and minor child including weekly meetings with a KVC investigator, not for neglect, but for the KVC investigator to oversee DCD's homeschooling and to "wait to see" what actions the district took to provide DCD with his Federally protected rights to an education according to IDEA 2004 and FAPE.

73.     The DA attempted to lock the plaintiff into a year-long contract with DCF and KVC which would require the plaintiff and minor child to be under close observation and investigation for the duration of a year.

74.     The DA's actions were clearly in an attempt to have a healthy, well balanced, child removed from a loving home simply because the plaintiff was trying to protect her child from a child abuser.

75.     The DA's behavior and continuing ambush style attacks on the plaintiff was excessive, harassing, and unsupported by law.  Title 42, U.S.C., Section 14141 - Pattern and Practice

This civil statute was a provision within the Crime Control Act of 1994 and makes it unlawful for any governmental authority, or agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

76.    The Truancy case against the plaintiff was dismissed 9/26/2016

**KVC**

77.    KVC was under court order to discontinue services on 9/26/2016 but continued until February 2017.  This is in violation of a court order and harassment.

**DCF**

78.    DCF realized (through the truancy court hearings) that the Plaintiff had recorded Kara Nicholson admitting she had not investigated the teacher, or looked at any evidence against the teacher.  DCF began systematically retaliating by severing all related services to the plaintiff and DCD.  Medical, food, and child support enforcement was halted without cause other than retaliation and DCF's efforts at self preservation.

79.    Child Support was not a DCF order.  Child Support was ordered out of Johnson County Courts as a part of a divorce and custody agreement between the Plaintiff and DCD's biological

father in 2010.  The biological father owed in excess of $50,000 and had been in contempt of a court order prior to the DCF action closing the case.

80.     DCF had no legal grounds to close the enforcement case.  Plaintiff recorded the call with CSE where she was informed the Kansas case had been closed.

81.     Plaintiff then contacted the federal offices of CSE and filed an inquiry.  That inquiry lead to an ombudsman getting involved. CSE began shifting stories and changing information in their system.

82.     Plaintiff contacted CSE again and asked if data can be changed, in retro, by a supervisor. She was informed that, yes, all data can be changed, in retro, by a supervisor.

83.     Months passed and still no enforcement, so plaintiff contacted the federal offices again and filed a complaint with the federal office of health and human services regarding the retaliatory action of the Johnson County DCF offices.

84.     Federal child support enforcement followed up and the child support case against the biological father was re-opened.  DCF then changed their story and claimed it had never been closed.

Plaintiff designated Kansas City, Kansas as the location of the trial.


                                                        S/Toni R Donahue        7/28/2017


Toni R. Donahue

322 S Broadway St

Fort Scott, KS 66701